## Garrison's Estate

The facts appear from the adjudication and supplemental adjudication of

GEST, J., Auditing Judge.—By deed dated May 30, 1912, duly attested by two subscribing witnesses, Letitia Willet Garrison, described as of the City of New York and temporarily residing in London, England, assigned to the Commercial Trust Company of Philadelphia, subsequently merged with the Bank of North America and Trust Company, which again merged with The Pennsylvania Company for Insurances on Lives, etc., certain securities in trust to pay the income to her, the said Letitia Willet Garrison, during her life, and after her death to pay the income to her sister, Lillie Bell Randell, during her life, and after the death of both to pay out of the corpus of the trust estate $50,000 to the House of the Holy Comforter, $50,000 to the Home for Incurables at Fordham, the said two donations being intended as a memorial to her husband, Commodore Cornelius K. Garrison; $50,000 to the Church Temperance Society, a corporation duly organized under the laws of the State of New York, and the sum of $50,000 in equal parts and shares to each of the three following institutions: (a) the Christmas Fund of the Diocese of Pennsylvania for Disabled Clergymen and the Widows and Children of Deceased Clergymen; (b) the General Clergy Relief Fund, a corporation created by the laws of the State of New York for its corporate purposes; (c) the Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers; "the balance of said Trust Estate to be held and applied by said Trustee and appropriated by it to such other institution or institutions as the said Letitia Willet Garrison may, from time to time, by writing addressed to or left with said Trustee, direct, limit or appoint. In the event of the total amounts thus ordered and directed to be disposed of and

distributed (including those herein specifically named) exceeding the gross total of the amount of the corpus of said Estate so held in trust as aforesaid, then the amount of each donation or gift herein and hereby ordered and directed shall be pro tanto abated, each of said beneficiaries, however, to receive the proportionate share of said trust estate based upon the ratio which each of said amounts bears to the gross corpus of the fund subject to distribution as herein directed. If at any time during the continuance of this trust any of the specific gifts of the corpus of said trust estate herein authorized and directed shall fail from any cause or should any balance remain unprovided for by said Letitia Willet Garrison, to pay over any such part or portion of said trust estate, together with all accumulations thereof, to such persons or person as would have been entitled to inherit the same from the said Letitia Willet Garrison under the intestate laws of the Commonwealth of Pennsylvania in case she had died at that time domiciled in Pennsylvania intestate, seized and possessed of the said corpus and all accumulation thereof, free, clear and discharged from each and every of the terms and provisions of this trust." The deed reserved the power of revocation, which, however, was never exercised.

Letitia Willet Garrison died on February 5, 1925, domiciled in New York, leaving a will and codicils stated to have been admitted to probate by the Surrogate of New York County on June 30, 1925, when letters of administration were granted to the Guaranty Trust Company. Ancillary letters of administration c. t. a. were granted to the Bank of North America and Trust Company by the Register of Wills of Philadelphia, dated July 22, 1925.

The trust continued for the benefit of Lillie Bell Randell, who died June 8, 1931, so that the trust has now terminated, and it was stated that The Pennsylvania Company for Insurances on Lives, etc., is ancillary administrator of the estate of Lillie Bell Randell.

It also appears that the General Clergy Relief Fund, a corporation created by the laws of the State of New York, has consolidated with the Church Pension Fund under the name of the Church Pension Fund, to which the gift directed by the will should be awarded. And it appears that the Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers was merged with the Ministerial Sustentation Fund by decree of Court of Common Pleas No. 1 of Philadelphia on October 28, 1918, and the charter was thereafter amended, the corporation being designated as the Board of Pensions of the Presbyterian Church in the United States of America, by final decree of said Court of Common Pleas No. 1, as recorded in Charter Book 98, page 535.

The persons who would be entitled to inherit from the said Letitia Willet Garrison, under the intestate laws of the Commonwealth of Pennsylvania, in case, as provided in said indenture, she had died at the termination of the trust domiciled in Pennsylvania intestate and seized and possessed of the said trust estate, are, according to the petition for distribution, the following: Lovell Dodd Randell, one-fourth; Virginia Campbell Randolph Stanton, one-fourth; Anne Boardman McAnerney, one-fourth; William Newell Randell, a minor, whose guardian is Gladys N. Drummond, appointed by the Probate Court for Androscoggin County, Maine, the last named being a foreign minor, and the award to his foreign guardian will be made subject to compliance with section 58 (g) of the Fiduciaries Act.

The right of the Church Temperance Society to participate in the distribution was contested by the next of kin of the settlor, and, at the conclusion of the first hearing, on April 7, 1932, the Church Temperance Society being not

then represented by counsel, I adjourned the case for a further hearing, on my own motion, in order that the claimant might be so represented. Accordingly, at the adjourned audit of May 25, 1932, Thomas E. Cogan, Esq., with whom was associated for the purposes of the case Frederick Behr, Esq., of the New York Bar, appeared for the Church Temperance Society.

The objections made were twofold, as stated in the paper book of counsel:

1. The Church Temperance Society has departed from the objects for which it was organized and has engaged in activities foreign to those for which it was incorporated.

2. Since the death of Letitia Willet Garrison, the Church Temperance Society has been entirely inactive in relation to the objects of its incorporation and the objects for which the gift was made.

The Church Temperance Society was incorporated under the laws of the State of New York, and its certificate of incorporation, approved by a justice of the Supreme Court of the State of New York, was, on April 16, 1889, filed in the office of the Secretary of the State of New York. And it further appears, by a certificate of the Secretary of State of the State of New York, dated April 11, 1932, that no certificate of dissolution of the corporation was on file in his office.

It is, therefore, clear that the Church Temperance Society as a corporation of the State of New York is in actual existence.

The purposes of the corporation, as stated in its certificate of incorporation, are:

(1) The promotion of temperance and the prevention and suppression of intemperance.

(2) The reformation of the intemperate.

(3) The removal of the causes of intemperance.

(4) The publication and circulation of temperance literature.

(5) The maintaining of places of Christian worship and of meetings in the cause of temperance.

(6) The organization of temperance associations as branches or otherwise.

(7) The advocacy of legislation tending to promote temperance and to restrain or prohibit intemperance.

(8) The organizing, establishing and promoting coffee and other temperance houses.

(9) And generally to do and perform any and all acts benevolent, charitable and missionary that shall tend to secure and advance the cause of temperance and to suppress or alleviate the evils of intemperance.

The testimony taken at the several hearings before me was voluminous and a large portion of it irrelevant. I have, however, examined it with due consideration and shall discuss it with all possible brevity.

First. It is claimed that the Church Temperance Society has, since the death of Letitia Willet Garrison, been entirely inactive in relation to the objects of its incorporation.

To some extent this is substantiated and is due to several factors, among which was the public scandal caused by the actions of the Rev. Dr. James Empringham, its former superintendent, to which further reference will be made; the lack of funds necessary for the prosecution of its corporate work, and the complications in the promotion of temperance caused by the Eighteenth Amendment and its enforcement legislation, which gave rise to certain differences of opinion among the members of the Episcopal Church, all of which matters appear in great detail in the testimony and the minutes of the corporation. The minute book of the executive committee of the society was

in evidence, and its officers are Rev. Dr. Joseph H. Dodshon, President, Rev. Dr. William P. Taylor, Secretary, and Henry M. Work, Treasurer. While it has no separate or individual office, Mr. Work testified that he, as manager of an estate called the Thomas Estate, of which Dr. Dodshon is trustee, has an office in the Mayflower Hotel, New York, where he also performed his duties as secretary of St. Luke's Hospital and secretary of the Cathedral of St. John the Divine.

In my opinion, the inactivity of the corporation, due to the causes mentioned or perhaps others, does not operate to cause a forfeiture of its claim to the gift under Mrs. Garrison's deed. The corporation is in legal existence, and mere inactivity, however caused, is not by any means a vital objection to its legal capacity to take. This would indeed be a strange objection, and no authority is cited for it. There are many charitable organizations which, for one reason or another, are doing little or nothing to promote the objects of their corporate organization and yet are entitled to receive money necessary for them to carry out their charitable purposes. Even when the charitable objects fail altogether, in this state, our courts have cy pres jurisdiction over the subject matter. And I may add, with reference to the prohibition legislation, that daily observation shows that the evils of intemperance still exist, and the suppression or alleviation of this evil are included among the corporate objects. So far as this branch of the case is concerned, I dismiss the objections to an award of the gift to the Church Temperance Society.

Second. It was argued, however, that the Church Temperance Society has engaged in activities foreign to those for which it was incorporated.

It was shown by the testimony that the Rev. Dr. James Empringham, the General Superintendent of the Church Temperance Society, organized and carried on an enterprise known as the Health Education Society, with headquarters on St. Nicholas Avenue, New York, and there physical examinations were made, medical attendance given and clinics conducted by Mr. Empringham, who was not a doctor of medicine, although his patients, some of whom were women, evidently regarded him as such. In conducting this enterprise, he undoubtedly received a large amount of money from credulous and unsuspecting persons, and finally an exposure of the affairs resulted in a public scandal. Dr. Empringham was, in ecclesiastical phrase, unfrocked, that is, expelled from the priesthood, and left New York City, and, on February 25, 1929, the Church Temperance Society undertook to dissolve the Health Education Society and disclaimed any connection with it. This action was certainly peculiar, for if the Church Temperance Society had no connection with the Health Education Society, as its officers positively testified, this resolution could not dissolve it. It is, however, easy to see that the Rev. Dr. Empringham, as General Superintendent of the Church Temperance Society, made use of that connection to involve the latter in his disreputable practices. From a careful consideration of the mass of testimony produced, I do not believe, and, therefore, find as a fact, that the Church Temperance Society was not, in its corporate capacity, concerned or engaged in the Health Education Society, and that the latter was the personal and individual enterprise of Rev. Dr. Empringham, and the Church Temperance Society was not responsible therefor.

Another charge was that the Church Temperance Society embraced the cause of prohibition as distinguished from temperance, and much testimony was cited to support this charge. And it does appear that in 1917, before the death of Mrs. Garrison, which occurred February 5, 1925, the Church Temperance Society for a time engaged in prohibition propaganda, until the pre-

siding bishop and council of the church called its attention to the matter, and the Church Temperance Society altered its policy. In my opinion, this deviation in its policy, even had it longer existed, was not sufficient to affect the right of the Church Temperance Society to receive the gift under the Garrison deed. This was a matter of the internal administration of the trust over which I have no jurisdiction or concern. I have no right to dictate the policy which should be pursued by the Church Temperance Society, whatever my personal views may be. A charitable corporation in the State of New York is, I assume, subject to supervision and control by some official of the state or by some court having visitorial powers. If duty is neglected or funds improperly diverted from corporate purposes, the remedy is there and not here.

This leads me to consider a matter upon which there has been much discussion. It appears that the Rev. Dr. Empringham, while conducting his illegal Health Education Society, incurred certain pecuniary obligations, the principal being an indebtedness to his wife, Ethel M. Empringham, stated in the report of an auditor, Norman C. Newman, to be $19,225.93, it being also stated that there was due to Dr. Empringham some $9384.90 for loan and salaries. And Dr. Dodshon, the President of the Church Temperance Society, testified that the society felt, if it received the Garrison money, they would try to reimburse Mrs. Empringham a certain sum of money, but the same reverend gentleman testified that the society had no legal commitment to Mrs. Empringham.

There also appears from the minutes of the society a resolution of March 13, 1929, that when the society is able it will give additional compensation to Mrs. Empringham, that is, in addition to the equipment of the Health Education Society. The connection of Dr. Empringham with the Church Temperance Society was terminated on May 9, 1929, and Dr. Empringham, in his letter of April 19, 1929, to Dr. Taylor, Secretary of the Church Temperance Society, claimed that the Church Temperance Society owed Mrs. Empringham and himself the sum of $30,000 which they loaned on the strength of the $50,000 legacy.

It was argued on behalf of the residuary beneficiaries that it appeared to be the intention of the Church Temperance Society to pay a large portion of the Garrison gift to Mrs. Empringham and thus divert it from the charitable objects of the foundation. Prima facie, it may seem that such use of the money would not be authorized by the charter of the corporation, but, in my opinion, I have no jurisdiction to determine the question. I may assume that if the Church Temperance Society should use the money illegally, its action would, as I have said, be subject to the supervision and control of the proper authorities of the State of New York having visitorial powers, and the officers of the corporation who made any illegal use of the corporate funds might subject themselves to civil or criminal liability. But with these questions, I repeat, I have nothing to do.

I should add a word about the testimony of Norman C. Newman, who produced his report as auditor of the Church Temperance Society, dated October 31, 1928. The reverend gentlemen who were present at the first hearing were so evidently unfamiliar with legal procedure that there was no cross-examination or testimony offered to rebut this report, and I adjourned the case. At the second audit, counsel for the Church Temperance Society claimed that it was the duty of Mr. Elcock to produce the witness for cross-examination and in default the testimony should be stricken out, which I declined to do. It was not Mr. Elcock's duty to do this, and, indeed, it would seem impossible for him to do it, as it appears from Mr. Newman's report that he is a

resident of New York and could not be subpœnaed to appear before me. Counsel for the Church Temperance Society might have applied for a commission to take the testimony of the witness as under cross-examination, but they did not do so. However, in my opinion, it clearly enough appeared, from the testimony at the second audit and especially that of Dr. Livingstone and Dr. Dodshon, that the report was not an audit of the financial condition of the Church Temperance Society but only of the Health Education Society, and consequently, while I will not strike out the testimony, I consider that it has been rebutted and should be disregarded.

I conclude, therefore, that the gift of $50,000 in dispute should be awarded to the Church Temperance Society for its corporate purposes.

### Supplemental adjudication

The adjudication in this case was filed on June 6, 1932, and the main facts are fully set forth therein. Briefly, Letitia Willet Garrison, on May 30, 1912, by her deed of trust, assigned certain assets to the Commercial Trust Company, subsequently merged with Bank of North America and Trust Company, which again merged with The Pennsylvania Company for Insurances on Lives, etc., the present accountant, in trust to pay to her the income during her life, and after her death, which occurred on February 5, 1925, to pay the income to Lillie Bell Randell during her life, and after the death of both (and Lillie Bell Randell died on June 8, 1931) the trustee was then directed to pay out of the corpus of the trust estate $50,000 to each of three charitable institutions and $50,000 in equal shares to other charities, thus aggregating $200,000, and, further, to pay over any balance remaining, unprovided for by said Letitia Willet Garrison, together with all accumulations, to such persons as would have been entitled to inherit the same from the said Letitia Willet Garrison under the intestate laws of the Commonwealth of Pennsylvania, in case she had died at that time domiciled in Pennsylvania, intestate, seized and possessed of the said corpus and all accumulations thereof. The persons so entitled were ascertained at the prior audit, and all are represented by John J. Elcock, Esq.

At the original audit, the beneficial heirs, as they may be called, contested the right of the Church Temperance Society to receive the sum of $50,000, but I decided that it was so entitled. Exceptions to my ruling were filed in behalf of the beneficial heirs, which exceptions will be duly disposed of by the court in banc.

The account, as filed and audited by me, showed a balance composed of securities carried at $264,163.37, from which the adjudication awarded the gifts to the charities of $200,000, leaving an apparent balance of $64,163.37, which was awarded to the beneficial heirs, and a balance of income of $4389.81, which, with further income of $4745.08, was awarded to the ancillary administrator of the estate of Lillie Bell Randell as income due to her at the date of her death, the adjudication stating that any further income was awarded to the four beneficial heirs.

No one at the audit called the attention of the auditing judge to the fact that, owing to the depreciation of the assets of the estate since the filing of the account, there would not be sufficient to pay the awards of $200,000 to the charitable institutions. Subsequently, however, there was presented to me the petition of the beneficial heirs setting forth that fact and praying for a further hearing in the case, in accordance with which I entered a decree, on August 25, 1932, directing that such further hearing be held on September 13, 1932, at which time all parties in interest appeared by counsel.

According to the testimony, which was not disputed, the market value of the securities assigned by the settlor on May 30, 1912, was $312,518.50; and at the date of the death of the settlor, on February 5, 1925, their market value was $274,626.25, and at the date of the death of Lillie Bell Randell, the succeeding life tenant, on June 8, 1931, the market value was $288,328.75, and, further, the market value of the estate on the date of the further hearing was $197,071.86, composed as follows: Cash, $162,671.86; $16,000 Lehigh & New England R. R. 5s at 85, $13,600; $40,000 Lehigh Valley R. R. 4s at 52, $20,800; making $197,071.86. In addition to which, the income on hand amounts to $11,296.61.

On this state of facts Mr. Elcock, representing the beneficial heirs, argued, as stated in his brief, that "the corpus of the estate now held by the trustee should be awarded as of the shares of the respective parties at the time of the creation of the trust" (or, as also stated in argument as of the date of the termination of the trust), "viz., approximately one-sixth of the corpus of the trust fund to each of the donees of the charitable gifts and approximately one-third of the corpus of the trust fund to the beneficial heirs." In other words, the gifts passing under the deed of trust must abate generally.

The basis of Mr. Elcock's argument is that the interests of the several donees under the deed of trust vested at its creation, just as the interests of legatees under a will vest at the date of the testator's death, and it may well be that, so far as the vesting of their interests is concerned, no important distinction can be drawn between a deed of trust and a will, but this does not afford a solution of the question before the court, which does not concern the persons who are ultimately to take, but the quantum of their shares, and, moreover, the gift in remainder is to the intestate heirs of the settlor, to be ascertained at the date of the death of the survivor of the settlor and of Lillie Bell Randell, so that it is a gift to an indeterminate class, and not to the heirs of the settlor as of the time of her death.

The intention of the donor in this case, like that of a testator in his will, was clearly that on the termination of the life estates the charitable institutions should receive the fixed sum of $50,000 each, and it was only the residue that was given to the beneficial heirs, who stand in the position of a residuary legatee. It was perhaps the expectation of the settlor, as distinguished from her intention, that the beneficial heirs should receive a substantial sum, it may be approximately $100,000, but even that is by means clear, for the settlor, in her deed of trust, after the gifts to the charities aggregating $200,-000, provided that "in the event of the total amount thus ordered and directed to be disposed of and distributed . . . exceeding the gross total of the amount of the corpus of said Estate so held in trust as aforesaid, then the amount of each donation or gift herein and hereby ordered and directed shall be pro tanto abated, each of said beneficiaries however to receive the proportionate share of said trust estate, based upon the ratio which each of said amounts bears to the gross corpus of the fund subject to distribution as herein directed."

This provision for abatement precedes the gift over of "any balance unprovided for" to the beneficial heirs and shows that the donor contemplated the possibility of her estate not being sufficient to pay even the charitable gifts in full. There is nothing to show that this abatement was intended for the benefit of the beneficial heirs, who, as I have said, stand in the position of residuary legatees under the will. As our Supreme Court said in Bentz v. Nieman, 6 Watts 85: "A residuary legatee can demand contribution for nothing. He gets but the fragments when every one else has been served; . . . finally,

if anything is left he gets it, but no one abates for him because his interest is dependent and indefinite." The argument that the pecuniary interests of the residuary legatees are fixed as of the date of the death of the life tenant and are not affected by the depreciation of the assets thereafter does not impress me. Of course, as soon as the surviving life tenant died, the trustee was liable to account and might have been compelled to file it, but at no time was it contended that it was the duty of the trustee to convert the assets immediately or that the trustee was liable for the depreciation that has occurred since the filing of the account.

I cannot see that Knecht's Appeal, 71 Pa. 333, cited by counsel, affects the case. There, as in Grim's Appeal, 89 Pa. 333, the question arose between devisees and legatees in connection with an abatement caused by the payment of debts, which was entirely different.

While it is true that the beneficial heirs are disappointed in their expectation of receiving a substantial part of the trust estate, this is a situation that frequently arises when, by reason of debts, depreciation of assets or the like, the residuary beneficiaries get nothing, being postponed to the pecuniary legatees. While this is to be regretted, I can see no way of relieving the beneficial heirs consistently with well-establised principles of law and repeated decisions of our courts.

I am, therefore, of opinion that the charitable gifts, aggregating $200,000, should be paid in full without abatement in favor of the beneficial heirs, but if there is not enough to pay them in full, they must abate inter se.

It was also claimed, in behalf of the charities, that they are entitled to interest on their gifts from the date of the death of Lillie Bell Randell on June 8, 1931, when the trust terminated and the charities became entitled to their gifts of $200,000. Logically, I can see no answer to this, at least if we follow the analogy afforded by the decisions in cases of testamentary trust: Boyles's Estate, 5 W. N. C. 363; Wilstach's Estate, 13 Dist. R. 733. According, however, to the account as now restated, the principal amounts to $197,071.86, showing a deficiency of $2928.14, and this much at least must be made good from the income, after, of course, that accrued to the date of the death of Lillie Bell Randell has been paid to her administrator, for the beneficial heirs cannot, as against the donees of definite amounts, be entitled to income or interest upon a nonexistent fund.

HENDERSON, J., October 28, 1932.—We have examined the voluminous record of this case which was patiently heard by the auditing judge, who, after filing his adjudication, granted a rehearing, and thereupon filed a supplemental adjudication.

Most of the exceptions raise questions of fact, upon all of which the auditing judge was amply supported by the testimony. Such questions are peculiarily for the hearing judge, and his findings will not be disturbed unless gross error is shown; and they will not be disturbed even though some other judge would have found differently. These rules are so well established that the citation of authorities would seem unnecessary.

The conclusions of law have been carefully reviewed and found to be correct, and for the reasons given by the auditing judge all exceptions are dismissed and the adjudication is confirmed absolutely.